IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

UNITED STATES OF AMERICA

v.                                                    CASE NO. 1:94-cr-01009-MP-AK

CLAUDE LOUIS DUBOC,

     Defendant.

_____/

## REPORT AND RECOMMENDATION

     This cause is before the Court on Defendant Claude Louis Duboc's motion to vacate.

Doc. 980. The Government has filed its response, Doc. 1002, and Defendant has filed an

amended reply with multiple exhibits. Docs. 1024, 1025, 1026, & 1027. This cause is therefore

in a posture for decision. Having carefully considered the matter, the Court recommends that the

motion to vacate be denied.

## BACKGROUND

     On March 10, 1994, John Richard Knock, Claude Louis Duboc, and Roger Darmon[1] were

indicted for drug and money laundering offenses. Doc. 2. In Count I, the Government charged

that "from a date unknown but at least by January 1, 1982, and continuing up to and including

the date of this indictment, in the Northern District of Florida and elsewhere," the defendants

conspired to possess with intent to distribute marijuana in violation of 21 U.S.C. § § 841 and

_____

[1]Darmon, a French citizen, was never apprehended and died in Corsica in 2001. Doc.
1022, Ex. The charges against him were dismissed on April 27, 2006. Doc. 1023

846.  In Count II, the Government charged that during this same time period and in the same

locale, the defendants conspired to import marijuana into the United States "from a place outside

thereof" in violation of 21 U.S.C. § § 952, 960, and 963.  *Id*.  In Count III, the Government

reiterated the time period and location, charging the defendants with conspiracy to "transport

funds from a place in the United States to a place outside the United States, which activity was to

be conducted with the intent to promote carrying on of a specified unlawful activity," in

violation of 18 U.S.C. § 1956.  *Id*.  Count IV sought the criminal forfeiture of illegally derived

property.  *Id*.

On March 25, 1994, Duboc was arrested in Hong Kong and extradited to the United

States.  Presentence Report at ¶ 4.  Duboc hired F. Lee Bailey to represent him.  Very shortly

thereafter, Duboc entered a change of plea.  Docs. 15 & 16.  As part of the Plea Agreement, the

parties acknowledged that Defendant "almost immediately" began cooperating, identifying

"assets he obtained from illegal drug activities."  Doc. 16.  He was specifically advised that he

faced a life sentence.  *Id*.  The Plea Agreement was predicated on Defendant's "express

representation" that he was "making a full and complete disclosure of all assets over which he

exercises control," both "domestic and foreign, that have been acquired directly or indirectly,

through unlawful drug trafficking activities," and that he would "identify all assets which were

used or intended to be used to facilitate the unlawful drug activities by the defendant and any

other individuals."  *Id*.  Defendant further agreed to "provide a list of every asset that is either

owned by him or is under his control," including "all properties, whether drug related or non-

drug related."  *Id*.  The Plea Agreement contained the standard language used in this District

regarding sentencing, leaving the issue solely to the discretion of the Court with no

recommendation from the Government.  *Id*.  The Agreement closed with Duboc's

acknowledgment that he had entered the Agreement "knowingly, voluntarily and upon advice of

counsel" and a representation by him and Mr. Bailey that there were "no other agreements...."

*Id*.

Very early on, issues as to the recovery of certain assets arose.  Doc. 25.  After a hearing,

the Court entered an order which reiterated that the Plea Agreement "contemplated defendant

Duboc's complete and unfettered cooperation with the United States, including the forfeiture of

substantial assets and assistance in liquidating those assets...."  Doc. 30.  By December, 1995,

irreconcilable differences arose between Defendant and Mr. Bailey, "causing conflicts which

make it impossible for Mr. Bailey to continue representing defendant."  Doc. 61.  The Court

allowed Bailey's withdrawal but retained jurisdiction over him "to obtain from him a full

accounting of the monies and properties held in trust by him for the United States of America."

Doc. 65.  The accounting included, but was not limited to, "a full accounting of the 602,000

shares of stock in Biochem Pharma, Inc., that was delivered to Bailey to be held in trust for the

United States."  *Id*.  The Court concluded by freezing Duboc's assets, including the stock.  *Id*.

Because its value quadrupled, the Biochem stock became a hotly contested asset, with

Mr. Bailey contending that "the stock belonged to him and that he was entitled to keep all profits

resulting from the increase in the value of the stock."  Doc. 67.  Bailey advised the Government

that "he had not held the stock 'in trust' for the United States and therefore did not believe that it

needed to be included [in the accounting] to comply with the Court's order."  *Id*.  The

Government claimed that Bailey's claim to the stock was "untrue" and that his actions went "far

beyond the agreement reached by him and the government...."  *Id*.  Bailey responded that Duboc

"*never even hinted* that my acceptance of the stock was for the purpose of holding it for appreciation for the benefit of the government, and ultimately himself."  Doc. 70 (emphasis in original).  He asked for a modification of the Court's order freezing the assets, as it was based on "false representations."  *Id*.

Following a hearing on the motion, the Court, after deferring ruling on Mr. Bailey's "claim of outright ownership of the stocks," found Bailey in civil contempt for failing to "either produce [the records and accountings], show his legal inability to do so, or demonstrate a good faith effort at compliance...."  Doc. 81.  The Court gave Mr. Bailey the opportunity to purge himself of the contempt citation by producing "all requested documents, accountings, and the stocks themselves" and by repaying "the approximately $3,000,000 that he has withdrawn from the Swiss account for his own personal expenses and attorney fees."  *Id*.

Another hearing was held, after which the Court concluded: "From the evidence presented to this court, it would not be an overstatement to say that Mr. Bailey, from May 1994 until the present time, has lived and financed his businesses almost exclusively from the funds generated by sale, or loans secured by, the Biochem Pharma stocks."  Doc. 112.  Because this violated the Court's prior order and because Bailey had not used his best efforts at compliance, the Court reiterated the finding of contempt.  *Id*.  Mr. Bailey was taken into custody on March 6, 1996, as a consequence of the contempt order.  Doc. 159.

The Government then moved to reset the hearing on its emergency motion regarding the merits of Mr. Bailey's claim of ownership of the stock.  As part of its motion, it indicated that Mr. Bailey was claiming that he and the Government had made a "'secret oral agreement'" which modified the forfeiture terms of the Plea Agreement.  Doc. 134.  The Government later

formally moved for forfeiture of the 602,000 shares of Biochem Pharma stock, which the Court granted subject to adjudication of third party claims.  Docs. 144 & 149.

After another hearing, the Court granted Bailey's motion for release from custody, finding that he had found an alternative method to purge himself from the contempt order.  Doc. 166.  Bailey then demanded a jury trial on the issue of his claim to the Biochem stock and challenged the forfeiture order.  Docs. 174 & 175.  The Government moved to dismiss the third-party petition, which Duboc joined.  Docs. 176 & 180.  The Government then moved to strike the challenge to the forfeiture order, Doc. 183.and yet another hearing was held.

Following that hearing, in which the Court flatly denied Bailey's challenge to the forfeiture order and his right to a jury trial on his claim, the Court synthesized the one remaining issue as follows: "Did the Government give the Biochem stock to Bailey, as trustee for the United States, so that he could use the stock to maintain his then-client's French properties pending forfeiture thereof; or, rather, did the Government give all 602,000 shares of the stock to Bailey, outright, in fee simple?"  Doc. 191.  The Court later denied the Government's and Duboc's motions to dismiss.  Doc. 204.

On May 17, 1996, Bailey and the United States stipulated to the dismissal of Bailey's third-party claim with prejudice.  Doc. 207.  The Court accepted the stipulation and declared the United States to be the fee simple owner of the Biochem stock.  Doc. 209.  It allowed Mr. Bailey the opportunity, however, to continue to seek recovery of his attorney's fees and expenses associated with representation of Duboc.  *Id*.  A final order of forfeiture was subsequently entered.  Doc. 211.

The issue of attorney's fees and expenses became the next point of contention.  After

Bailey submitted his motion for approval of fees for other attorneys and expenses, Doc. 222, the Government opposed the amount submitted as either outside the scope of the agreement, unreasonable, or undocumented.  Doc. 227.  A hearing was held on the motion, and after various supplements were submitted, the Court, on October 30, 1997, granted Bailey's motion in part and denied it in part.  Doc. 286.  Though the Court found that Bailey was entitled to over a million dollars in expense, he in fact owed the Government over $400,000.00 because of profit he made from selling the Biochem stock.  *Id*.[2]

During this entire time, Duboc remained in custody but had not been formally sentenced. In December, 1997, the Government requested that the case be set for sentencing.  Doc. 290. After a series of continuances and a status conference, the Court learned that Duboc planned to file a motion to withdraw his guilty plea and a motion to dismiss the indictment based on prosecutorial misconduct.  Doc. 307.  What followed was a series of motions:  (1) motion to withdraw guilty plea "which was entered into as a consequence of advice provided by counsel who labored under a conflict of interest and who failed to provide effective assistance," Doc. 312;  (2) motion to dismiss indictment based on "lack of venue since none of the criminal acts...occurred in the Northern District of Florida; due process violation due to prosecutorial misconduct, and...pervasive government misconduct," Doc. 313; (3) motion to recuse trial judge, Doc. 314; and (4) motion to vacate forfeitures.  Doc. 315.

The Court held a hearing on the pending motions, including the Government's motion

---

[2]This was not the end of the matter, *see*, *e.g*., Doc. 557 (motion to enforce Court's order), but for purposes of Duboc's motion to vacate, further history regarding Bailey's compliance with the Court's orders is not necessary.

"for a determination that the defendant breached the plea agreement."  Doc. 349.  The Court

denied all of Defendant's motions and granted the Government's motion.  *Id*.  In denying the

motion to withdraw the plea, the Court found:[3]

> [C]lose (and effective) assistance of counsel was available to defendant at all
> times during the plea.  Such assistance, coupled with his own investigations,
> ensured that defendant's plea was knowing and voluntary....[A]t the time of the
> plea, defendant was represented by at least 5 highly experienced criminal defense
> lawyers....
>
> Despite his attorneys' collective experience, however, the defendant argues that
> he was denied close and effective assistance of counsel for three reasons.  First,
> he claims that his lawyers conducted no independent investigation and therefore
> missed viable defenses to the charges against him.  Second, defendant asserts that
> his lawyers labored under a conflict of interest arising from a financial interest in
> the outcome of the case.  Finally defendant argues that Mr. Bailey committed
> ineffective assistance of counsel by stating that he had a secret deal with the
> government (whereby Defendant would be guaranteed a certain sentence) when in
> fact Mr. Bailey had no such agreement.
>
> Having reviewed the pleadings...the testimony at the hearing, and the evidence
> presented, the court concludes that these contentions are without merit.  First,
> with regard to whether defendant was secretly relying on Mr. Bailey's alleged
> representations of a secret deal, the defendant specifically said under oath at the
> plea colloquy that there were, in fact, no secret or undisclosed promises or
> inducements that led him or induced him to plead guilty.  Further, the defendant
> specifically said that no one, including the government, his attorneys, or any other
> persons, had made any promises or statements that were in any way different
> than, or in addition to, the written terms of the agreement, that in any way induced
> him to plead guilty.  Moreover, Mr. Bailey, Mr. Shohat, and Mr. Miller for the
> government each stated under oath at the plea colloquy, upon specific inquiry by
> the court, that no secret agreements existed and that the written plea agreement
> was the sole agreement of the parties.  The same promise is written into the plea
> agreement, a mere 3 inches from where Mr. Duboc and his attorneys signed the
> final page of the agreement.  In addition, Mr. Shapiro testified that he specifically
> advised defendant not to rely upon any representations by Mr. Bailey regarding a
> specific sentence and not to enter into the plea agreement because it did not

---

[3]The Court will quote extensively from this Order, as the issues arise again in the instant
proceeding.

contain a specific promise as to a sentence.  Defendant simply made a conscious, informed strategic choice to proceed with the plea despite this advice.

* * *

The defendant's argument that his lawyers were ineffective because they had a financial stake in the outcome of the case is also meritless.  The defendant first claims that the government agreed to allow a $3,000,000 fee to Mr. Bailey out of forfeitable assets with an implicit condition that the fee was only going to be authorized if defendant cooperated and pled guilty.  The defendant contends that fees are not normally payable from forfeitable assets and that the government allowed such an arrangement in the instant case to control the actions of the defense counsel.  The documents and testimony in the record reveal, however, that the government made it very clear to Mr. Duboc's counsel that only the court would decide whether forfeitable assets could be used to pay the fees and the amount of the fees to be paid therefrom.

Secondly, defendant undercut this theory with his own testimony.  When questioned concerning his failure to identify all of his assets during meetings with the government, defendant claimed that he though he was only being asked to identify assets which were tainted as proceeds from drug activity.  He then stated that he failed to identify over $20,000,000 in an Austrian account because he claimed that these funds were not tainted.  If these funds were not tainted, however, they could have been used to pay the attorneys without requiring the use of forfeitable funds and the creation of the conflict.  Nevertheless, the defendant either chose to allow the attorney conflict, knowing that he could avoid it by using the secret $20,000,000 in Austria, or he was simply lying about thinking that the $20,000,000 was untainted.  It is the defendant's burden to prove that the alleged financial conflict of interest was real, and so neither the court nor the government is required to sort out which of defendant's conflicting statements are true and which are lies.[4]

Further, the defendant cannot show any conflict concerning the use of the Biochem Pharma stock which had any bearing on defendant's plea on May 17, 1994.  The controversy which eventually ensued between the government and Mr. Bailey did not occur until well after the guilty plea was entered.  Also, at the meeting regarding the use of the stock to maintain the foreign properties and possibly for fees, the parties were clearly told that only the court, and not the

---

[4]This money eventually became the subject of another indictment against Mr. Duboc for conspiracy to bribe a federal judge and to tamper with a witness and for money laundering offenses.  *United States v. Duboc*, Cause No. 4:98cr46-RH-WCS (N.D. Fla.).

> government, would have the final say about whether such funds can be used for
> fees and, if so, the amount of said fees.  At the time of the guilty plea, there
> simply was no conflict on the part of defendant's counsel with regard to the stock.
>
> Thus, the court finds that defendant's counsel rendered effective, conflict-free
> assistance in this case.  In addition, the court, in the plea colloquy...made very
> certain that defendant (1) understood exactly what he was doing when pleading
> guilty, and (2) had no complaints about the services his attorneys rendered....
>
> As it did at the plea colloquy, the court now finds that the defendant was alert and
> intelligent, not under the influence of any intoxicating substance, and that he
> understood the plea agreement and entered it knowingly and voluntarily.

*Id*.

As to the motion to dismiss the indictment, the Court found that Defendant's challenge to

the Court's venue was not properly before it, Defendant having waived all defenses at the plea

colloquy, but it also determined that Defendant could not meet his burden of showing that venue

did not properly lie in this District.  *Id*.  In reaching that conclusion, the Court noted testimony

given at the trial in *United States v. Grenhagen*, GCR 93-1043-MMP (N.D. Fla.), which

> revealed a series of meetings and correspondence in 1992 and 1993 between
> various members of the conspiracy including Duboc, Vacca, Martenyi,
> Grenhagen, and Brown during which they discussed plans to off-load, into the
> United States, a large quantity of marijuana provided by defendant.  At least one
> of these meetings took place in the Northern District of Florida. Although these
> plans were never consummated, evidence reveals that Mr. Duboc financially
> supported the co-conspirators and gave every indication that eventually the
> venture would go forward.  While he did state that a few elements of the plan
> needed to be scrutinized more closely...he did not ever terminate the plan.  The
> government has met its burden of creating a triable issue of fact on the venue
> question.

*Id*.

The Court also rejected Defendant's argument that the Government "attempted to use the

fee arrangement to control the defense lawyers in this case and that such actions violated due

process," citing its previous findings regarding counsel's alleged conflict of interest. *Id.* As to

his request that Judge Paul recuse himself, the Court found that all of Defendant's complaints

"relate to actions taken by the court during the official proceedings in this case," and thus,

because he could not show pervasive bias against him, there was no basis for recusal. *Id.* The

Court also rejected Defendant's claim that the Court should recuse itself because it allegedly

participated in the plea negotiations. In reaching that conclusion, the Court stated:

> Defendant points to a meeting in which the court and the attorneys in this case
> discussed the procedures to be followed in managing certain of the defendant's
> assets in the event of forfeitures. The defendant claims that this meeting
> constituted judicial participation in plea negotiations, contrary to [Fed. R. Crim.
> P.] 11(e)....
>
> * * *
>
> In the instant case, the meeting complained of did not address any possible
> penalties, did not regard the consequences of pleading or not pleading and simply
> was not coercive in any way. The court and the attorneys merely met to discuss
> procedures to be followed in managing certain of the defendant's assets.

*Id.*

The Court likewise denied the motion to vacate the forfeitures. *Id.*

The Court then turned to the Government's motion to find that Defendant had breached

the terms of the Plea Agreement based on Defendant's "consistent[ ] untruthful[ness] in

disclosing his assets and his level of responsibility in the conspiracy." *Id.* In that regard, the

Court found:

> Defendant clearly breached the plea agreement by consistently failing to provide
> truthful and complete information to the government. The most glaring example
> is the failure to report over $20,000,000 in a secret Austrian account....Defendant
> claimed that he thought he was only required to report assets he thought were
> tainted as drug proceeds. This explanation goes against the express language of
> the plea agreement and of the judge during the plea colloquy....Accordingly, the

court finds that defendant knowingly gave untruthful or incomplete information to
the government regarding that money.  That alone would be sufficient to breach
the plea agreement, but the testimony at the hearing established numerous other
instances of defendant giving untruthful or incomplete information regarding his
assets and his involvement in the conspiracy.

*Id*.

Defendant filed objections to the PSR and moved to compel the Government to file a

5K1.1 motion and for downward departure.  Docs. 380 & 381.  The Court denied Defendant's

motions and sentenced him to life imprisonment on Count II and 240 months on Count III, to run

concurrently.  Doc. 387.[5]  Defendant appealed the denial of the motion to withdraw, and the

Eleventh Circuit remanded for a finding regarding whether there was any evidence that "Bailey

intended to claim the appreciation of the [Biochem Pharma] stock as his own prior to DuBoc's

entering his guilty plea in this case."  Doc. 698.  According to the appellate court, this was

"critical to our determination of whether Bailey was operating under a real conflict of interest."

*Id*.  The court therefore vacated the order denying Duboc's motion to withdraw his guilty plea

and remanded for further findings.  *Id*.

In preparation for an evidentiary hearing, the Court issued an order explaining its

understanding of the Eleventh Circuit's remand order and setting forth a list of questions upon

which it believed Defendant himself would need to testify.  Doc. 756.  On the day of the hearing,

Duboc "through counsel and in direct response to inquiry by the court, advised that he would

---

[5]Duboc's co-defendant Knock was arrested by French officials in Paris, France, on April
17, 1996.  Presentence Report for John Richard Knock at ¶ 35.  A lengthy extradition process
ensued before he was returned to the United States approximately a month after Duboc's
sentencing.  *Id*.

refuse to answer any questions in this proceeding, invoking his claimed right against 'self incrimination.'" Doc. 758.  Consequently, the Court found:

> Here, Mr. Duboc has had the opportunity to present evidence to establish his
> claim of ineffective assistance of counsel, and has wholly failed to do so.
> Invoking his Fifth Amendment right does not allow him to avoid his burden on
> this motion to withdraw his guilty plea.
>
> In short, the defendant must present testimony regarding the impact of the conflict
> on his decision to plead guilty, but now refuses to do so.  Additionally, his refusal
> is not supported by any privilege, and the burden of persuasion is on him.
> Thus...this Court is left in a position where it is not necessary to determine if an
> actual conflict of interest exists.  Since the defendant refuses to provide testimony
> regarding whether any such conflict had an impact on his decision to plead guilty,
> the existence *vel non* of any such conflict would not affect Mr. Duboc's claim.

*Id*. (citation omitted).

The Court concluded that Defendant had not carried his burden of showing ineffective assistance of counsel based on a conflict of interest by Bailey.  *Id*.  It nevertheless offered him the opportunity to reconsider his decision not to testify until the following day.  *Id*.

Defendant persisted in his refusal to testify, and the Court, after analyzing the record, including Bailey's and Duboc's testimony which had been given in earlier proceedings in this case, concluded:

> As discussed above, it is clear that Mr. Duboc can point to no conflict of interest
> regarding the stock which caused Mr. Bailey to advise Mr. Duboc to begin his
> massive cooperation on April 13, 1994.  Thus, in order to succeed in showing a
> "real conflict of interest" as those words are used in the remand order, Mr. Duboc
> would have to show that his position would have somehow changed between
> April 26, 1994, and May 17, 1994, but for Mr. Bailey's conflict of interest, and
> that such a change in position would have been to his advantage.  That
> information resides only in Mr. Duboc's mind, and he has refused to provide it to
> the Court.  The need for further testimony from Mr. Duboc is exacerbated by the
> events of this case which have called into question Mr. Duboc's credibility.  Just
> one example is the letter of March 31, 1997, to Mr. Bailey, in which Mr. Duboc
> offers to "recant my deposition from the Florida Bar based on my state of mind at

the time."[6]

> Based on all of the above, this Court hereby makes the factual finding that Mr.
> Bailey did not intend to claim the appreciation in the stock's value as his own at
> the time that Mr. Duboc decided to enter the guilty plea.  Accordingly, the Court
> continues to hold that Mr. Bailey did not suffer a real conflict of interest at the
> time Mr. Duboc decided to enter the guilty plea and that, therefore, Mr. Duboc's
> guilty plea was not the result of ineffective assistance of counsel.

Doc. 777 (citation omitted).  The case was returned to the court of appeals.

Defendant filed a petition for writ of mandamus challenging the Court's handling of the

remand, which the Eleventh Circuit granted in part "to the extent that we direct Judge Paul to

issue a final and appealable order on Petitioner's motion to withdraw his guilty plea, from which

order Petitioner may take an appeal."  Doc. 831.  Defendant then requested a new hearing "to

present all the evidence that tends to prove not only that Bailey intended to steal the Biochem

stock before the plea was consummated but also tends to prove the defense contention that Mr.

Bailey's conflict of interest adversely impacted his representation of Mr. DuBoc...."  Doc. 841.

The motion was granted, and a hearing was eventually held, resulting in yet another meticulous

order from the Court.

In this order, the Court reiterated some of his prior findings and elaborated on others.  In

particular, the Court dismissed any suggestion that the "putative 'conflict'" between Duboc and

Mr. Bailey over the Biochem stock developed before the plea, concluding:

> Simply put, based on the Court's intimate knowledge of what transpired at the
> beginning of this case, the Court finds that at the time Mr. Duboc pled guilty, Mr.
> Bailey did not intend to claim the stock appreciation as his own, for he well
> understood that the stock was only held in trust.  It was only later, after he had

---

[6]Bailey was subsequently disbarred for, *inter alia*, his handling of the Biochem stock.
*Florida Bar v. Bailey*, 803 So.2d 683 (Fla. 2001), *cert. denied*, 535 U.S. 1056 (2002).

nevertheless taken improper personal liberties with the stock, that Mr. Bailey
came up with the lie that he believed that the government had inexplicably given
him the stock in fee simple.

Doc. 917.  The Court also found that because Defendant could not show there an actual conflict

on Mr. Bailey's part with regard to the stock, he could not meet the first prong of *Cuyler v.*

*Sullivan*, 446 U.S. 335 (1980).  *Id.*  The Court further concluded that Duboc could not meet the

other prong of *Cuyler*, "whether any conflict had an adverse effect on counsel's performance."

*Id.*   In that regard, the Court found that both Defendant and Mr. Bailey had "lied before this

court and their testimony cannot be relied upon."  *Id.*  It looked instead to

> unimpeached sources to substantiate the findings that Mr. Duboc fully understood
> the consequences of his guilty plea, that there were no hidden or secret "deals"
> with the court or the government for a particular sentence, and at the time of the
> plea, Mr. Bailey did not operate under any type of conflict of interest.  Without
> limitation, those individuals were Assistant United States Attorney Gregory
> Miller, Assistant United States Attorney Jimmy Hankinson, defense attorney
> Robert Shapiro, and defense attorney Edward Shohat.

*Id.*

> The Court concluded:

> Based on all of the above, this Court hereby makes the factual finding that Mr.
> Bailey did not intend to claim the appreciation in the stock's value as his own at
> the time that Mr. Duboc decided to enter the guilty plea.  Additionally, the Court
> finds that counsel for Mr. Duboc had no reason to believe that they could only be
> paid out of forfeitable funds and that the government, and not the Court, would be
> the one who decides that issue,.  Indeed, counsel and Mr. Duboc were repeatedly
> told exactly the opposite.

> For all these reasons, the Court continues to hold that Mr. Bailey did not suffer a
> real conflict of interest at the time Mr. Duboc decided to enter the guilty plea.
> Moreover, Defendant has offered no evidence that after that date Mr. Bailey
> would have recommended any other reasonable strategy and that defendant would
> have accepted that strategy, but for Mr. Bailey's intentions regarding Mr. Duboc's
> assets.  Therefore, defendant has offered no evidence establishing a link between
> the alleged conflict of interest, if there even was one, and his decision to forego

any reasonable defense strategy.  Therefore, even under the more lenient *Cuyler* standard,[7] defendant has failed to establish that his plea should be withdrawn.  Accordingly, the motion to withdraw the guilty plea is again denied.

*Id*.

Defendant once again appealed.  On appeal, the Eleventh Circuit applied *Cuyler* and found that "because, at the time DuBoc pled guilty, defense counsel Bailey did not intend to claim the stock appreciation as his own, Bailey did not have an actual conflict of interest."  Doc. 943.  It also concluded that the Court "correctly found that DuBoc did not satisfy the adverse effect prong of the *Cuyler* test."  *Id*.  In reaching that conclusion, the court stated:

> The evidence showed that Bailey recommended and DuBoc decided to plead guilty before Bailey knew of the stock's existence.  Moreover, DuBoc's failure to meet his burden of proving adverse effect was demonstrated by his refusal to answer a series of questions posed to him by the district court regarding the matter.  Additional factors, including the timing of DuBoc's motion to withdraw his guilty plea, further support the findings that DuBoc failed to establish either prong of the *Cuyler* test.

*Id*.  In a footnote, the court pointed out that the Government had "strenuously" argued that *Strickland* controlled the analysis of Defendant's claims of a financial conflict of interest.  The Eleventh Circuit noted that "it makes no difference because DuBoc could not satisfy even *Cuyler*'s more lenient standard."  *Id*.

## DISCUSSION

The instant motion to vacate ensued.  On this occasion, Defendant presses the following

---

[7]The Government had argued that the stricter *Strickland* standard applied, but Duboc had argued for the use of *Cuyler*, which did not require a showing of prejudice if the defendant could show the existence of an actual conflict and an adverse impact on the lawyer's performance. Because the Eleventh Circuit had not determined the standard to be used in a case not involving joint representation, the Court used the more lenient *Cuyler* standard.  *Id*.

claims:

> (1) "F. Lee Bailey promised Mr. Duboc a five-year sentence when no such agreement existed";
>
> (2) "F. Lee Bailey promised that he had a secret deal with the Government and the Court when no such deal existed";
>
> (3) "F. Lee Bailey had a conflict of interest from the outset of the case as a result of his fee arrangement";
>
> (4) "Mr. Bailey was ineffective for advising Mr. Duboc to plead guilty to charges where this Court did not have jurisdiction or venue";
>
> (5) "Mr. Duboc's due process and Sixth Amendment rights were violated by the trial court's participation in the plea negotiation process."

The only one of these five claims which has not been previously and extensively litigated in this Court is the claim that the Court lacked jurisdiction over this case because the indictment failed to alleged that any overt acts occurred in this District.  Otherwise, all of Defendant's claims, in one form or another, has been rejected.  Defendant suggests that because the Court has not necessarily considered them in the context of *Strickland*, it should proceed to analyze them in that context now.  However, cloaking the claims in *Strickland* does not save them, as the underlying bases have been rejected.  For example, the Court has repeatedly found that Defendant's plea was knowingly and voluntarily entered and that there were no secret deals, promises, or agreements made to him or among the parties, and it has looked to Defendant's own sworn testimony at the plea hearing and the representations of all counsel for support.  Analyzing this claim under *Strickland* will not either save or revive it or convince the Court that the prior rulings were made in error.  The Court would only add now that the law is well established that a "guilty plea means something.  It is not an invitation to a continuing litigation dialogue between

a criminal defendant and the court." *Murray v. United States*, 145 F.3d 1249, 1254 (11th Cir. 1998).  In fact,

> the representations of the defendant, his lawyer, and the prosecutor at...a [plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings.  Solemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

*Blackledge v. Allison*, 431 U.S. 63, 73-74 (1977).  Defendant's continued pressing of these claims against Bailey are "contentions that in the face of the record are wholly incredible," and further analysis beyond what the Court has previously found is not warranted.  *See also United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000), *cert. denied*, 531 U.S. 1131 (2001).

The conflict of interest claim has been litigated within an inch of its life, and if it was meritless under *Cuyler*, it is certainly meritless under the more demanding *Strickland* standard. Furthermore, the venue issue has been rejected, as has the contention that this Court improperly participated in the plea negotiations.  As to the only unlitigated claim challenging this Court's jurisdiction, it is patently meritless.  This Court has original jurisdiction of "all offenses against the laws of the United States."  18 U.S.C. § 3231.  "[I]llegal possession and sale of drugs affects interstate commerce, and Congress accordingly has authority under the Commerce Clause to criminalize and punish drug-related activity."  *United States v. Jackson*, 111 F.3d 101, 102 (11th Cir. 1997).  This constitutional authority includes Congress' right to make it a crime to "conspire or agree with someone else to do something which, if actually carried out, would be a violation of" 21 U.S.C. § 841.  Offense Instructions 87, *Eleventh Circuit Pattern Jury Instructions–Criminal* (2003).  Furthermore, a drug indictment is sufficient if it alleges a

conspiracy to distribute or import drugs, the time during which the conspiracy operated, and the statute allegedly violated, even if fails to allege any specific overt acts in furtherance of the conspiracy.  *United States v. Hawkins*, 661 F.2d 436, 454 (5th Cir. 1981).

## CONCLUSION

Having carefully considered the matter, the Court respectfully **RECOMMENDS** that Defendant Duboc's motion to vacate, Doc. 980, be **DENIED**.

**IN CHAMBERS** at Gainesville, Florida, this   *31st* day of January, 2008.


*s/ A. KORNBLUM*
**ALLAN KORNBLUM**
**UNITED STATES MAGISTRATE JUDGE**


## NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within 15 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 10 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**